**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 2 3 2019

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS

|  |  |  |
|---|---|---|
| **PHILIP LEE HURD,** | ) | **CIVIL ACTION NO.** 3:19-cv-00261 DPM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| **EQUIFAX INFORMATION SERVICES LLC,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | This case assigned to District Judge ___MARSHALL___ and to Magistrate Judge ___VOLPE___ |

## PRELIMINARY STATEMENT

1.     This is an action for damages brought by an individual consumer against the Defendant for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 et seq. as amended.

## JURISDICTION AND VENUE

2.     Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

3.     Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4.     Plaintiff Philip Lee Hurd is an adult individual residing in Blytheville, AR.

5.     Defendant Equifax Information Solutions LLC is a consumer reporting agency that regularly conducts business in the Eastern District of Arkansas, and which has a principal place of business located at 1500 Peachtree St. NE, Atlanta, GA.

## FACTUAL ALLEGATIONS

### *Defendant's Practices Concerning the Sale of Reports on the "Deceased"*

6.     Defendant is regulated as a "consumer reporting agency" ("CRA") under the FCRA 15 U.S.C. § 1681a(e).

7.     Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and Defendant also sells credit scores.  15 U.S.C. § 1681a(e).

8.     Pursuant to the FCRA, Defendant must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy."   15 U.S.C. § 1681e(b).

9.     Pursuant to the FCRA, Defendant must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."  15 U.S.C. §§ 1681e(a) & 1681b.

10.     Defendant place a "deceased" notation or marking on reports when they are advised from any of their many data furnishing sources that a given consumer is deceased.

11.     The furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

12.     Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

13.     Defendant does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

14.     Defendant does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

15.     A deceased notation is a very unusual marking upon a credit file or credit report.

16.     In some cases, in order to assure accuracy, Defendant sends letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their consumer credit files, such as in

2

cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws. But Defendant has no similar procedure to notify the consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to Defendant to be placed in said consumer's credit file or report.

17.     Defendant regularly receives the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased. But Defendant does not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

18.     Defendant will only use the Death Master File to sell additional products for an additional fee which are designed to show whether a given consumer is truly deceased.

19.     Indeed, Defendant employs no procedures *at all* which assure that a consumer with a "deceased" mark on his/him report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

20.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant employs no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

21.     Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant employs no procedures which assures that a consumer with a "deceased" mark on his/him report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

3

22.     Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

23.     Nevertheless, Defendant routinely sell to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

24.     Upon Defendant's reports with a "deceased" mark sold to third parties Defendant's never calculate or provide a credit score for that consumer.

25.     Defendant knows that third party credit issuers use a credit score in order to process a given credit application.

26.     Defendant knows that many third-party credit issuers require a credit score in order to process a given credit application.

27.     Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

28.     Defendant knows that living consumers are turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

29.     Defendant has been put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because the Defendant is reporting them as "deceased" and without a credit score.

30.     Defendant has received and documented thousands of disputes from consumers complaining that their credit report had them erroneously marked as "deceased."

31.     Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

4

32.   Nevertheless, Defendant employs no procedures which assure that a consumer marked as "deceased" on one of Defendant's reports is, in fact, deceased.

33.   Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

34.   Defendant has no independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, which reinvestigation was triggered by a consumer dispute.

35.   Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers which they have marked as "deceased" under any circumstances.

36.   For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

37.   Defendant will only remove a deceased consumer's file from its credit reporting database when they are no longer valuable to Defendant – meaning that nobody is continuing to buy those reports from the Defendant.

38.   Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

39.   Defendant profits from the sale of reports on the deceased.

40.   Defendant has in their credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

41.   Defendant knows that truly deceased consumers do not apply for credit.

42.     Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud.  Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

43.     Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

44.     Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

45.     Defendant has no similar death certificate, executorship paper, or any other proof requirements for its data sources which report a consumer as deceased or for the buyers of its reports which access the purportedly deceased consumer's information.

46.     Indeed, Defendant sells reports on the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

47.     For consumers who are deceased, there exists no permissible purpose under the FCRA for Defendant to ever sell their credit reports, absent a court order.

48.     Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### *Case Specific Facts*

49.     Plaintiff has been marked by Defendant as "deceased" on his Equifax credit reports since at least April 2019.

50.     Plaintiff is not deceased.

51.     Defendant did not calculate or provide any credit score for or on Plaintiff, even though they sold reports about him to third parties marking him as "deceased."

52.     Prior to sale of their consumer report about Plaintiff, Defendant did nothing to investigate the information received regarding the deceased notation.

53.     Defendant continues to publish and disseminate such inaccurate information to other third parties, persons, entities and credit grantors.  Defendant has repeatedly published and disseminated consumer reports to such third parties from at least April 2019 through the present.

54.     As a result, Defendant made it practically impossible for Plaintiff to obtain credit.

55.     As a result of Defendant's conduct, Plaintiff has suffered actual damages in the form of credit denial or loss of credit opportunity, credit defamation and emotional distress, including anxiety, frustration, embarrassment and, humiliation.

56.     At all times pertinent hereto, Defendant was acting by and through their agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

57.     At all times pertinent hereto, the conduct of Defendant, as well as that of their agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

## COUNT ONE – VIOLATIONS OF THE FCRA
### PLAINTIFF v. DEFENDANT

58.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

59.     At all times pertinent hereto, Defendant was a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. §§ 1681a(b) and (f).

60.     At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

61.     At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

62.     Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, Defendant is liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency in violation of 15 U.S.C. § 1681e(b).

63.     The conduct of Defendant was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to the Plaintiff that are outlined more fully above and, as a result, Defendant is liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

### JURY TRIAL DEMAND

64.     Plaintiff demands trial by jury on all issues so triable.

### PRAYER FOR RELIEF

**WHIMEFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendant, based on the following requested relief:

(a)     Actual damages;

8

    (b)      Statutory damages;

    (c)      Punitive damages;

    (d)      Costs and reasonable attorney's fees; and

    (e)      Such other and further relief as may be necessary, just and proper.

Dated: September 20, 2019

Respectfully submitted,

**SmithMarco, PC**
David M. Marco
55 W. Monroe Street
Suite 1200
Chicago, IL 60603
312-546-6539
Fax: 888-418-1277
Email: lsmith@smithmarco.com
***Attorneys for Plaintiff***

9